Good morning. My name is Vincent Amberly. I represent the Virginia Board of Medicine. I'm here to talk about the decision to grant summary judgment for the defendants in this case. I'm not so sure that the traditional summary judgment rules were followed at all. What the defendants did rather than take really material facts and the facts that were issued that we go through in discovery, they ignored them. And they basically represented the court that the plaintiff hadn't proven their case and then they put in facts that weren't in dispute. Certainly they weren't in dispute. They weren't really at issue. They avoided, they didn't address the allegations in the complaint, which was their obligation. They didn't, they also, without addressing those allegations or pointing to a lack of evidence of the record, they failed to address any material allegations of the complaint. Instead, they went and just summarily said that the plaintiff hadn't proven their case. What's interesting is there were 23 disputed facts that we put in in evidence and those are just totally ignored. They're in docket 132. Those were the facts that had to do with the competition. Those were the facts that had to do with the allegations of the complaint. Now granted, this was a little bit complicated in some ways, but in other ways not. Virginia is one of only three states that does not have a separate board of doctors of chiropractic to supervise the chiropractic doctors in the state, as is in 47 other states. Instead, they have the Board of Medicine, which is composed primarily of medical doctors. And there is one doctor of chiropractor on the board, but she wasn't permitted to sit on the final panel, the formal panel that reviewed the allegations against Dr. Petrie. Now, there was some confusion, I think, with regard to the relevant market here. The First Amendment complaint, which is in the record, basically goes through, it's actually very detailed. It talks about the primary care physicians, but it also talks about chiropractic primary care physicians. Chiropractic primary care physicians are a little different than primary care physicians because they don't give a lot of medicine, they can't prescribe medicine, and they focus on the causes of problems. But insurance companies, and this is all in the record, insurance companies have actually preferred to send more people to chiropractic, preferred primary care physicians because the costs are less, they actually have better results, and they prefer them. Now, anyone that's a medical doctor that's been a primary care physician and is losing business is concerned, and that's what we allege in the complaint. That was the key issue, that was one of the key issues, there were many other ones. But I think, and I don't think I need to go through all the paragraphs of the complaint, but there are many that define chiropractic primary care physicians. What happened is, kind of typical of how defendants would do things here, is they took the deposition of Dr. Petrie, and they didn't talk about chiropractic primary care physicians. In fact, they had a difference of opinion as to what a primary care physician was than we did. What exactly are you asking this court to do vis-a-vis the board's application of Virginia's scope of practice laws? Well, we're asking a number of things. First of all, to reverse the summary judgment and send it back down to trial. Second, to overrule the decisions with regard to the experts, which I'll come to in a minute, and some of the other things that were done. What has been done incorrectly here, in your view? What's the crux of your argument with respect to Virginia's scope of practice laws that you're asking us to address? The scope of practice, that's an interesting point. It's not limited to just the scope of practice. What we're saying is that they took their own interests as competitors, and they used that. First of all, this is very analogous, I think, to the state board of dental, North Carolina Dental Board, where the Supreme Court last year affirmed the Fourth Circuit decision that made it very clear. There is no active supervision. What I'm trying to do is clarify in my own mind what you are seeking. It seems to me, and you've said it in your complaint, you said the crux of the complaint is that the board's decision was contrary to Virginia law. I'm quoting from your brief. One of the things that happened after our brief, and I think it's important to call this to the attention of the court, the legislature in Virginia amended Virginia Code 8.01-581.20, and basically found that in determining the standard of care in Virginia, you do not need to be a Virginia-licensed health care provider. Okay, but that's not what I... No, your brief says that the crux of your complaint is that what the board did is contrary to Virginia law. And I am trying to extrapolate from that your argument with respect to the existence of an antitrust problem. Well, they didn't have a basis to do what they did. The board did not have a basis to do what they did. They chose to do it in a closed room because they were competitors. They didn't have a basis in Virginia law to do what they did? She had not violated the things. Is it your argument that the board did not have a basis in Virginia law to do what it did? In part, in part, yes. And in what part is it not Virginia law? It's similar to a state action exemption under the antitrust laws. Sure, it's a board that was created by the state, but they operate independently of the state. They have no state entity that supervises them, that approves what they do. They just do it. This is a classic case of where there is no... It's not like the North Carolina Board of Dentists. Actually, it is like it because they basically don't have any specific... I'm sorry, it's a two-part... NACAL has a recognition that private parties engaging in any competitive activity there is a real danger. I'm sorry, that's not the right one. There's no state supervision here. There's no active supervision. What the state does is they set up this entity, but it operates on its own funds. It does its own things. It pays some state agencies to do investigations, but there is no active supervision of what this board does. This board is not... isn't the state operating. There, as this court and as the Supreme Court said in the... In your brief, you indicate that Dr. Petrie is not alleging that the Commonwealth's statutory scheme of licensure and scope of practice violate the Sherman Act. We're not alleging that. Okay. It's the enforcement of it and the interpretation of it. By the board. By the board. It violates what Virginia's statutory scheme of license and scope of practice. Well, not really. I mean, it doesn't violate that. That's what you said. What page are you referring to? Page 43. Okay. Well, here again, I think what we're saying is that it was contrary to Virginia law and it constituted a power grab by the medical doctors. It was basically doctors that saw her as a competitor basically made their decision primarily because of that, not because of what she did, but we're not questioning what they interpreted. And Virginia state courts have found no problem with it. Well, Virginia state courts haven't really opined on that issue. They basically said that they did what they had to do under the statute for whatever, but they didn't look at the anti-competitive effects. And the problem we have here is there is nothing in the board's bag of tricks and authority that gives them power to review any trust concerns. It's a federal matter, and that's why we're here in federal court. And they didn't even think about it. They just went ahead and did it. That being the board. The board. And the board basically, what happened on the state level really doesn't make a lot of difference, except for the fact that their motivation was a competitive motivation to keep chiropractors from doing the kinds of things that either Dr. Petrie did or that chiropractors wanted to do that were competitive to medical doctors. For instance, in a complaint. And we've got this in the briefs too. There is a statute that came along just a couple of years ago. The Department of Transportation authorized doctors to give tests to truck drivers. There really wasn't a whole lot involved, and it turned out to be fairly lucrative. Most of the states allowed chiropractors to do tests just as they did medical doctors. Not in Virginia. The medical doctors on the board that were in charge of the board, they were the majority of the board, basically said they didn't want chiropractors getting any of that potential income, and they forbade chiropractors from providing Department of Transportation tests. That's another example in any competitive action by them. Another thing that came out in the depositions was that the board's own records of who they would take action against, who they would discipline, showed a pretty high frequency for going after... They'd have the same number of complaints for medical doctors and chiropractors, but they'd have two or three times as much prosecutions of chiropractors than medical doctors. It was pretty disparate, but because it's not in the record right now, I'm not going to go into it. I think the key thing is that the board... is that they just baldly assert that Dr. Petrie has no evidence. They don't point to anything in the record. They don't point to the elements of the case or anything else. They just say she didn't treat her case. That's it. That's not how some of the judgment cases should go. Clearly, not only did the court not consider the evidence in light most favorable to the non-moving party, which was our client, but basically just didn't even look at our facts, our disputed facts in the case. The Robertson case, which is a Fourth Circuit case just a few years ago, held that direct evidence in the form of official public action is sufficient evidence of concerted activity because it leaves no uncertainty about the terms of the agreement, let alone whether one was made. We have that exact situation in this case, and yet some of our judgment was found for the defendants. Do you allege the existence of another affected competitor? What we allege was that the medical doctors and the others on the board that had control of the board were trying to keep the doctors or chiropractic doctors... My question was, is there another affected competitor? Because to establish an antitrust violation, we've suggested that the elimination of a single competitor, standing alone, doesn't prove anti-competitive. So I was asking, is there another affected competitor? Absolutely. Some of this is in the brief. Basically, because the board... Is it in your complaint? Well, it is, and it's also... I'm looking at page 7 of the reply brief. Basically, we said that the board's orders carry a precedential or quasi-precedential effect. Doctors and chiropractors who want to get involved in the Department of Transportation testing or do other things that are done in most every state in this country can't do it because this board has said you can't do it. It's competitive. They don't say it's competitive, but that's basically the only reason they have for it. There's no reason whatsoever. There's nothing under the statute. There's nothing that the legislature has done that says some of these things shouldn't be done by doctors or chiropractors. But the board still tows the line and says, we don't want you to do it because it competes with us. It's pretty clear. I mean, it's... We went through this. Granted, the injury to Dr. Petrie is clear, but there's other doctors that would like to be able to compete in these areas, and they can't. And is there any... Do you allege any... make any allegation with respect to specific competitors who are deterred from competing? I think we do generally. We didn't specifically. One of the reasons for that is there's a very strong chilling effect. We are aware of some doctors that are very much supportive of what Dr. Petrie is doing, but they don't want to step forward because they're afraid the board is going to come after them. I mean, and that's been the history. I see my time is almost up. I'd like to reserve five minutes for rebuttal, if that's okay. Thank you. Thanks. All right. Ms. Allen. May it please the Court, my name is Sarah Oxenham Allen from the Office of the Attorney General, and I represent the appellees, the Virginia Board of Medicine, and the individual appellees. Simply put, Your Honors, this is not an antitrust claim. This is a case of a disgruntled licensee who is seeking to take advantage of NC Dental's new requirements to collaterally attack her sanctioned by the board in federal court after her state court appeals have been exhausted. This is not a state action immunity case because there's no underlying antitrust violation that needs to be immunized from liability. The appellant's antitrust claim fails for three reasons. First, she can't demonstrate an agreement by the board that unreasonably restrains trade. Second, she hasn't defined the relevant markets affected by her sanction or the class of competitor that she is alleged to represent. And third, she can't show any anti-competitive effects in any relevant market from her sanction. Failure to prove any one of these three elements is fatal to her antitrust claim, and the district court correctly found that she lacked evidence to support each element. Mr. Amberley spoke about the disputed facts that we did not address, but that totally ignores the fact that in our reply summary judgment brief, we went through each one of those disputed facts one by one and explained why there was no evidence supporting those. The district court agreed and based summary judgment on that basis. This court should affirm summary judgment for the appellants. So the first deficiency of proof for her claim is that she hasn't shown an agreement and restrained trade. An antitrust plaintiff must show something more than just independent action by the alleged conspirators. She has to show conscious commitment to a common scheme designed to achieve an unlawful objective under the Monsanto standard that the Supreme Court has enunciated. Any inference of conspiracy has to be reasonable in light of competing inferences that show independent action among the board members. And this court has been very clear that just mere deliberation or the mere opportunity to conspire is insufficient to infer conspiracy. In both Oxana v. Page Memorial Hospital and Cooper v. Forsyth County Hospital Authority, this court affirmed summary judgment where the plaintiffs failed to show evidence of a conspiracy by demonstrating something more than independent action. And that was despite communications among the defendants, the opportunity for them to conspire during deliberations and resulting adverse actions taken against the plaintiffs. Counsel, let's parse this out a little bit. Sure. For example, Virginia Law. What's required to be a dietician? Because you're restricting her, Dr. Peterson, being a dietician. Why can't a chiropractic professional be a dietician under Virginia Law? That was not what she was sanctioned for doing, Your Honor. She was sanctioned for treating type 2 diabetes, treating thyroid disease, treating other metabolic disorders. She was also ‑‑ there was a nonscope of practice violation, but there was a deceptive advertising. I'm reading it. I think it says ‑‑ it does say what the diabetes is, but it says, and that's a semicolon, then, which is an independent sentence, right? Right. It says, holding herself out as a registered dietician and nutritionist without meeting the criteria set for the Virginia law. So that's my question to you. What in Virginia law would prohibit a chiropractic professional from being a dietician or nutritionist? Your Honor, there's defined scopes of practice for all of the professions that are under the ‑‑ Exactly. That's what I want you to know. I'm a Virginia lawyer, as a matter of fact. Right. And I just want to know, tell me what under Virginia law, because it's interesting because there are dieticians in Virginia. Yes, Your Honor. If you're telling me someone who's gone through the rigor of chiropractic, formal academic training, wouldn't be qualified to do it, but somebody else is, so I want you to tell me, what is it that under Virginia law qualifies dieticians and nutritionists and that chiropractics would be outside of that scope? Well, Your Honor, I think the question is not that she was just providing dietary advice. No, no, that's your question. I'm talking about my question. My question is to deal with that. That's my question to you. Your Honor, I have to admit, I don't know all the separate requirements for the different scopes. Well, is the question that she couldn't or that she hadn't? She just hadn't. She could apply and become a dietician, presumably. You're right, Your Honor. And I would imagine she would easily qualify. Right. Is that correct? Did Judge Duncan answer your question before? Are you incorporating Judge Duncan? Excuse me. Are you incorporating Judge Duncan's response to my question as yours? It sounds good to me. I'm going to have to make sure because I want to talk to you. Right. Okay, so that's your answer. So you're saying that this is not about practicing necessarily out of the scope, but that she didn't apply for an application for that or to be registered. That's the only reason, but otherwise she could? No, Your Honor. Oh, I didn't think she was. She was practicing medicine. The board found that she was practicing medicine, which was outside the scope of chiropractic. Right. Because diagnosis management and treatment of diabetes is more than dietetic advice. And it's a whole lifestyle approach. And it involves medicine that she is not allowed to prescribe as well. Was she prescribing medicine? No, Your Honor. She was not. She was giving supplements. So you mean to tell me a chiropractic, for example, could not counsel you in diabetes, too, by saying, listen, you need to walk, you need to watch your diet, you need to do those things, let your body heal itself. So you can't do that. You need a doctor to give you medicines all the time, right? You can't let the body heal itself and exercise, do those things? No, Your Honor. I mean, I can tell you that. You can tell me that. Exactly. I thought so, too. But that was not all that she was doing. And that was not what she was saying. Well, what was she doing that was outside of Virginia law, that she was prohibited from by law? Because at antitrust, you stand behind what the legislature has passed. But beyond that, that's his point, that once you get beyond that, then he's alleging collusive activity for the purposes of keeping yourself in a better economic position by not having a competitor in areas that otherwise don't need to be restricted from. That's the articulation of his argument, of his case. So now tell me what it is that makes that practice of medicine. Well, Your Honor, the question of whether or not the board exceeded their discretion that they are allowed to interpret the scope is a question that is more directly addressed to whether this was immune under the State Action Immunity Doctrine. The State Action Immunity Doctrine immunizes behavior that would otherwise be anti-competitive by a state entity. Right. Here, there's been no showing that there's been any antitrust violation that needs to be immunized. There's no harm to competition from her sanction. She has not been able to show any. She has not been able to show even one chiropractor who was operating the way she was in Virginia or who wanted to operate the way she did in Virginia and who was deterred by her sanction. And she hasn't shown that prices went up, that output decreased, or that quality of services were made inferior by her sanction. There's just been no showing. But these orders are made public, aren't they? Yes, they are, Your Honor. So chiropractors would look at this, and you'd be ill-advised to look at this ruling and not realize that, yeah, I better not be a dietician or nutritionist. Well, Your Honor, the way to reach an entire class of competitor, as she alleges, is to do something that applies to an entire class of competitor. The board could have promulgated a rule of regulation addressing this class. They could have issued a guidance document or a position paper. They could have even changed the licensing requirements for chiropractors. A disciplinary order on its face applies only to one licensee. The board cannot act on its own volition to bring a disciplinary action. So anybody who was similarly situated to the appellant would have to wait for the board to get a complaint against him. Then the board would have to do an investigation, which the licensee would be notified of. Then they would have to have a probable cause review. Then there would have to be a hearing where a sanction was found. It really wouldn't have much of a deterring effect. They would have to weigh the likelihood of all of that happening to them. This takes several months, by the way, up to a year at least. And then they would have to weigh the costs and benefits of continuing to practice in this manner during this lengthy disciplinary process. I'm sorry. That's all right. The board just intends this doesn't have any commentative effect. I didn't. Is this process complaint? So I want to make sure I understand. You're saying that the board doesn't target people? It can't target people? No, Your Honor. This is very unlike the North Carolina Dental Board, which had extensive conversations among themselves about the problem of low-cost non-dentist teeth whiteners. They agreed to go after them. They issued 47 cease-and-desist orders to 29 different practitioners, and they had an obvious and demonstrable effect of making them all leave the market. This is not at all what happened here. There has to be a complaint by the board's governing structures. Here, the four complaints that were received against the plaintiff that form the basis of her sanction were received from patients that had medical concerns. It was not received by competitors who were worried about her undercutting them. My question specifically is within the board's governing structure processes, they can only investigate if they were in response to a complaint is what I'm asking. Yes, Your Honor. That's mandated by the APA, the Virginia APA. They can only investigate a specific complaint. Yes, Your Honor. But they can make ruling as this here in terms of changing the scope of what chiropractors can do, can't they? No, they can't change. Only the legislature can change the scope of chiropractic. They can issue rules and regulations that further define certain terms if they wanted, but that process is a very extensive process. It probably would have active supervision, and that's not what happened here. But you have what we would call Chevron-type regulatory authority to interpret, and they do that independent of individual complaints and investigations, does it not? No, Your Honor. I don't think they could do that here. They couldn't determine whether or not, in fact, the regulation would apply generally to chiropractic? Certainly they do. They don't determine regulation as to how it might apply generally? I mean, the board doesn't issue any kind of – the board issues guidance documents. That's what Chevron-type reference is. Right, right. And that would be some – that would be one of the ways that the board could go after an entire class of competitor, but that is not what they did here. But instead here, they did better. They gave her a $25,000 fine. And a six-month suspension. That's a whole lot of get-your-attention, isn't it? That is, Your Honor. And they usually, as the 30B6 witness for the board said, they usually impose fines when they've shown that the practitioner or the licensee has benefited financially from the things that she is sanctioned for doing. She also received a six-month suspension when she has never attempted to convert back into practicing again. May I ask this question? How would she have known that being a dietitian or a nutritionist was outside of the scope of her practice? Well, Your Honor, again, I would say that's not exactly what she was sanctioned for doing. Well, how would she have known that, for example, advising somebody about lifestyle changes related to diabetes, too, would be outside of her practice? I'm sorry to pick straws with you, but that's not exactly – I mean, it was – No, you can pick straws all you want. Her advertising said that she could reverse type 2 diabetes through what she was doing, and that – So reverse – well, would it not be reversing diabetes, too, if you told someone, listen, you need to walk three times a week, you need to change that? Would that be reversing it? Could it reverse? Would that be reversing? It might possibly reverse, but it would be very dangerous for someone to rely only on that without, you know, making sure that their insulin needs were met. Was there any evidence that she told somebody to get off insulin? I'm not 100 percent sure of that. I know there was some live testimony at her formal hearing from some patients that talked about things they understood. There was a lot – the thing that she was sanctioned for deceptive advertising was that she wasn't clear that she was not a doctor, a medical doctor, that many people were confused to find out, once they started seeing her, that she was actually a chiropractor. I guess, unless they've changed the Virginia law, MDs can do anything when it comes to healing, right? An MD could pull your teeth, wouldn't have to be a dentist, correct? I guess so. They would be held to the standard of a dentist, but they could, couldn't they? An osteopath as well, those are the – they have the same scopes of practice. And there are 16 different professions under the Board of Medicine, so there's quite a few different defined scopes of practice for all of those. But, Your Honor, the other problem with her complaint and the unsupported allegations in her complaint that have not been established is that she hasn't defined the relevant market that she's operating under. You know, under the Federal Trade Commission and the Department of Justice Horizontal Merger Guidelines, there are different traditional market analyses that you could use to define your relevant product market. She hasn't done any of those or done the tests that are in the relevant case law. She hasn't adequately defined the class of competitor that she represents. And her complaint, her briefs, and her pleadings are very inconsistent on this point. She's making a big point of how we're confused about whether or not she's a primary care provider or a chiropractic primary care provider. That's because she's been very inconsistent about what those even are. She has not shown what services are provided in each one of those markets and whether those services are substitutable with each other from the perspective of both consumers and insurers. That's what you need to do to show that something's in the same market. In addition, her economic expert defines still more markets, saying that there were separate markets for the management treatment of diabetes, the diagnosis, management, and treatment of other metabolic disorders, and still a third one for thyroid disease. And it's unclear if these services are even included in her alleged primary care market or chiropractic primary care market. And as I've said before, even more damaging is the fact that she has not identified even one chiropractor in Virginia who was currently providing the services she was providing or who would like to enter such a market. So you say this case could be premature? That's right. In the two years of discovery since her sanction, it's been even longer now, but since at the close of discovery, she hadn't been able to show any other similar sanctions by the board of a chiropractor in the years before her sanction or in the two years of fact discovery after her sanction. And that is despite having complete access to all of the confidential case files of the board. Of course, after her sanction, that may have come both ways. That could prove her point. I guess, but it's hard to see any competitive effect if the board hasn't gone after anybody else that's similarly situated to her. There's, you know, she talks about the DOT exams, and that's a good example of a situation where the Virginia legislature has specifically opined on that. The last two years, there has been a bill introduced specifically to amend the scope of practice of chiropractic to include those precise Department of Transportation exams. Both years, the bill has failed, and that is an indication of legislative intent that the legislature doesn't want those exams included in the scope of chiropractic. So for the board to sanction a licensee for providing them means that they are exactly interpreting the legislative intent beyond the scope of practice and behind the scope of practice. And, Your Honor, I would just like to close with one thing that, say, in the wake of the Supreme Court's decision in NC Dental, disgruntled individual licensees like the appellant have been increasingly emboldened to convert adverse disciplinary actions against them by state regulatory boards into federal antitrust claims. However, as I've said, the lack of state action immunity does not show that there is an underlying antitrust violation that needs to be immunized. And in this case, the district court granted summary judgment but not on state action immunity grounds because it found that the appellant lacked support for each element of an antitrust claim. And as the First Circuit Court that's considering this issue since NC Dental, denying summary judgment to the athletes now would not only contradict the district court's findings but would also send a message to all of the other licensees across the country that they can retry their state board sanctions in federal court for antitrust travel damages. What are you saying with respect to state action immunity? Are you saying that it doesn't exist here or it doesn't matter? It doesn't matter because there's no antitrust violation here. She has not made out an antitrust violation. State action immunity only exists... We only get to it once we... Right. I think I understand. Right. Yeah, but it's a tautology if you use state action to justify your action and then you say, oh, no, we're immune. We have to almost first strip away as if you were a private actor to determine whether or not that would be, in that environment and market, anti-competitive. And then we go back and we find it is, whether or not you may be immune. But you can't be a tautology and say, okay, well, what you did was all protected by the legislature. Therefore, you never get to that point. From an analytical standpoint, you have to at least look at it without that first. And then you might say, well, yes, it would have been under normal circumstances. But because, as you say, we're acting on a legislative mandate and intent, we are immune. No, Your Honor, I'm not saying... If you analyze this, may I answer? Sure, sure. If you analyze this as if the board were totally a private entity, not state-related at all, and brought this action against the appellant, there is no anti-competitive effect. Well, that's what I think we agree on. Right. You're not using state immunity as to that aspect. That's what I'm saying. But you said even if they were, you may have a backstop for it. And as the FTC guidance, which we didn't get to, but as the FTC guidance on state action immunity has pointed out, and as this case shows, single licensee disciplinary actions typically only have a de minimis effect on competition. So therefore, we respectfully ask that you uphold summary judgment. Thank you. Thank you. Senator Maloney, you have some time. Thank you, Your Honor. I'd have to differ with the last comments on state action immunity because, quite frankly, there is no active participation here. That leg has never been met, and it probably should have happened, but since it's not really part of the case here, I want to move on. I think Ms. Allen's approach to that is similar to their approach to a lot of things that are problems for their cases, just to ignore them or say it doesn't exist and move on. And that doesn't really address the problem. Your Honor talked about dietician and nutritionist issues. Those were in the final order against Dr. Petrie, and they were interpreted by the board because the Board of Medicine interprets all kinds of public health issues that are not really things that medical doctors do but the things that other doctors do. And you're right. A doctor of chiropractic, like Dr. Petrie, had to go through a lot of chiropractic certifications that involved dieticians. She had a nutritionist dietician courses in chiropractic school. She was very qualified. Where does this say that she had to get separate qualification? Nowhere. The board just pulled that out of thin air and zapped her with it, and they did it because they could, because they're the ones that can rule on competitors, and that's what they did here. There really isn't anything that's printed that I'm aware of that says you can't practice in the dietician and nutrition area. I think there are some regulations that you can't hold yourself out as a nutritionist or dietician, but she didn't do that here, so I'm not sure what the issue is. I'm just going to hit a couple of things. She wanted to say that there was no agreement, but again, as I said in Robertson, the kind of public action that was taken here is sufficient to be in agreement. See page 8 of Barbara Plybury, and further additional language on page 9. That's the only requirement that Dr. Petrie has in this particular case. We believe that she's shown that there is an agreement. It's clear that the medical doctors on the board want this to go away because they are putting down doctors of chiropractic, and they've done that for a long time. Interestingly, once this antitrust lawsuit was filed in December of 2013, the number of prosecutions of doctors of chiropractic went down by the board for the first time in many, many years. We've got trackings going back to 2005, 2006. Another thing that's interesting is someone said that the board didn't really want to do this. They were just doing their job. But Dr. Harp, and this quote is in my papers in a number of places, after his deposition, he says, this is good, we can create a bright line between medical doctors and doctors of chiropractic, or chiropractors. He said that. He was under oath, he said it at his deposition, and now Dr. Harp was the head of the board, but he wasn't a voting member, but he'd been the director of the board for 15 or 16 years, and most of the doctors that came onto the board would listen more to him than anybody else because he'd been there before. He was sort of their... And what are you saying is problematic about that? Well, he wanted to create a bright line between the MDs and the chiropractors. But, for instance, should there even be a bright line when it comes to dietician or nutritionary stuff? It doesn't say anywhere in the code. The Virginia legislature says nowhere that other doctors can't... M.D.s being medical... M.D.s being medical doctors, correct. Well, okay. Presumably the fact that you have to graduate from medical school would be a bright line. Right. Well, the Board of Medicine is made up primarily of medical doctors. There are a couple of other... There is one chiropractor, I think there's one podiatrist, there's a couple of other doctors, but the vast majority are medical doctors. And my only point is that it can be read in a competitive sense, but it can also be read as a simple statement of fact. They are different. That's true. Well, and as I said earlier, in Virginia, it's one of only three states that doesn't have a separate board of chiropractic because there are some things that are unique and different, but those are really kind of unknown to the medical doctors. Any other questions before I sit down? I've got 10 seconds on my... No, no. Thank you very much. Thank you so much. Appreciate it. I'm okay. Do you want to... I'm okay. Whatever you like. Okay. All right. We'll come down and bring counsel to the seats on the next case.
judges: Roger L. Gregory, Allyson K. Duncan, Richard L. Voorhees